**MODIFY and AFFIRM; and Opinion Filed July 24, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00612-CR

### JOSE REYNALDO ZAMORA-BANEGAS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1600847-V**

## MEMORANDUM OPINION
Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Osborne

Appellant, Jose Reynaldo Zamora-Banegas,[1] was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. Appellant raises four issues on appeal: (1) the evidence was legally insufficient to support the jury's verdict, (2) the trial court erred in allowing the jurors to take the original jury charge into the jury room during deliberations, (3) the trial court abused its discretion by overruling appellant's motion to suppress his statements to the Dallas Police detectives about this offense, and (4) the judgment should be reformed to reflect a conviction for capital murder based on a robbery instead of capital murder based on a terroristic threat. We affirm and modify the judgment as requested.

---

[1] Appellant asked to be addressed as "Zamora" at trial. Appellant was referred to as "Mr. Zamora" during the trial.

## Background

On the night of June 21, 2016, Jairo Gonzalez, a fifty-two year old immigrant from Nicaragua, was shot and killed on Montfort Drive in north Dallas. An autopsy revealed that Gonzalez was shot twice; both bullets caused significant internal damage, including transecting his right kidney and perforating his iliac artery. Gonzalez's injuries caused him to "bleed out" within a matter of minutes.

Testimony was heard that Gonzalez suffered from back pain and it was his habit to walk up to three miles at a time, often in the evening after dinner. The shooting occurred close to the apartment complex in which Gonzalez lived and on his regular walking route.

The shooting was witnessed by Robert Young, who was in his vehicle and exiting his apartment complex across the street. Young noticed a Ford Mustang[2] backed into the gated entrance of the apartment complex on the opposite side of the street with its lights turned off. He also noticed a man, *i.e.*, Gonzalez, walking from the south heading north on the sidewalk. About five seconds later, two people got out of the Mustang, approached Gonzalez, and shot him several times. Young testified that these men ran back to the Mustang, got in, and shut the doors; the Mustang started up and drove north on Montfort "pretty fast." While Young did not hear any words spoken and did not see a robbery, he was certain the killing was planned.

Young testified that the driver of the Mustang stayed in the vehicle during the shooting. Based on Young's observations, the driver would have been able to see the shooting from the Mustang. Young was not able to get a license plate number and he could not identify any of the assailants.

---

[2] Young's specific description of this vehicle was as follows: "It was a Mustang. It was not a V8, it was a V6 not a GT. It was dark in color. It was, you know, 2005 to, or 2004 to – you know, they made that body style for so many years. I just, you know, it was like I knew it wasn't a GT. It was a V6. It was dark in color." He also testified that the Mustang had a racing stripe. Young was certain about his description because he had owned Mustangs.

Young was "terrified" and worried about his safety. He did not report the shooting to the police until the next day.

Two shooting calls were placed to the Dallas Police Department.[3] Responding police officers were unable to find anything in the way of physical or forensic evidence at the scene of the shooting except blood on the ground.

Dallas Police Department Detective Casey Shelton, the lead detective on this case, initially had very little information with which to work. Shelton eventually received information that appellant, age 28, owned a Mustang that matched the description Young gave of the Mustang that night. Vehicle records confirmed that appellant had purchased this vehicle. Shelton also received information that two other young men – J.A.Z., age 17, and K.H., age 16 – were involved in the shooting.

Shelton learned that all three suspects had worked for the same detail shop attached to a Toyota dealership in north Dallas. A conversation with the owner of that shop revealed that all three suspects had left their employment after the date of the murder. It was thought that the three men had moved to Houston.

Shelton checked area pawnshops in north Dallas and located a surveillance video from First Cash Pawn which showed appellant and his Mustang at that pawnshop at 3:30 p.m. on the day of the shooting. Appellant pawned a gold necklace.

Shelton made several unsuccessful trips to Houston trying to locate appellant. On October 30, 2016, Shelton got a call from Maria Moreno, a woman who claimed to be appellant's common law wife and the mother of his children, wanting to discuss appellant and his role in the shooting. Shelton travelled to Houston to speak to Moreno on November 9, 2016. Moreno was able to give Shelton information on not only appellant, but also on J.A.Z., K.H., and a fourth person, J.M.

---

[3] Neither of these callers testified at trial.

Moreno told Shelton that K.H. wrecked appellant's Mustang when he drove it from Dallas to Houston. She also provided information that appellant's brother might have possession of the murder weapon. Shelton obtained an arrest warrant for appellant and J.A.Z. but lacked sufficient information to obtain an arrest warrant for K.H. At this time, appellant, J.A.Z., and K.H. were still at large and believed to be outside of the country, possibly in either Honduras or Mexico.

In March of 2017, Shelton received notification that Homeland Security apprehended appellant in Laredo. Shelton and Dallas Police Detective Pedro Trujillano[4] traveled to Laredo to interview appellant.

During this interview, appellant told the detectives that he and his cousins – J.A.Z., K.H., and J.M. – went to Dallas to work for a while. All of his cousins were minors. The day before the shooting appellant and different cousins were smoking marijuana in a park and decided to steal a gold necklace from a woman at the park. Appellant was the getaway driver. Appellant later pawned the necklace for money to purchase marijuana. Appellant acknowledged that he believed J.A.Z. had murdered someone in Honduras before coming to the United States.

On the day of the shooting, J.A.Z. asked appellant to take him, along with cousins K.H. and J.M., to purchase marijuana. When appellant learned that his cousins did not have money, he asked them how they intended to purchase marijuana. J.A.Z. told appellant they were going to "get it [/] take it. We'll get it [/] take it now, they said." According to appellant, J.A.Z. was dressed in a black skeleton outfit that included a skull mask and a black jacket.

Appellant testified that they were all smoking marijuana five to ten minutes before J.A.Z. told him to park the Mustang in a dark area at the apartments. J.A.Z. told appellant they were going to rob Gonzalez who was walking down the sidewalk. Appellant asked "With what? What are you

---

[4] Appellant does not speak English and Detective Trujillano is a Spanish speaker. The interview, which was videotaped, was conducted in Spanish and later admitted at trial. A written English translation was also prepared by a certified translator and admitted into evidence. Portions of this interview were read to the jury in question and answer form by the prosecutors at trial.

going to rob him with?" J.A.Z. then told appellant that "they had something" but appellant did not see a gun at that time.

After appellant parked the vehicle, J.A.Z. put on the skull mask. K.H. and J.A.Z. got out of the vehicle and approached Gonzalez. Appellant stated J.A.Z. had his whole face covered when he approached Gonzalez. Appellant heard two gunshots and then K.H. and J.A.Z. ran back to the vehicle. Appellant gave the following description to the detectives:

> And suddenly I see them running to the car. I asked them, what happened? They told me that they had shot. And then I cussed at him and everything and I asked him why. Then the version that they told me, they say that they – I don't know who pulled out the gun, the gun was there. And that they told him, give me your money. And he says that the man told him, yes, I'll give you your money right now. And then they say that they thought it was a gun. . . .Then they shot him. I don't know if the man had a gun or not. . . . You-all know then he was going to give them his wallet and those guys got nervous.

Appellant then drove away. J.A.Z. told appellant that Gonzalez stated he would give them his wallet,[5] but they believed he was pulling a gun so they shot him. Appellant did not know if Gonzalez had a gun or not; he further did not know which of his cousins had the gun until he saw it in J.A.Z.'s waistband when they returned to the car. Appellant also told the detectives that J.M. stayed in the Mustang the entire time and did not do anything.[6]

The group fled to J.M.'s apartment and regrouped. Later they returned to the scene of the shooting to see if Gonzalez was dead. Appellant told the detectives "[T]hey were all nervous and that, yes, that yes, that we had killed him. We thought that we had killed him . . ." Appellant left his Mustang at J.M.'s apartment and they all went their separate ways.

---

[5] The medical examiner testified that Gonzalez's body was in possession of a wallet, $34 in cash, some bank cards and some jewelry.

[6] Detective Shelton testified that he had no information that J.M. took an active part in the offense.

Shortly thereafter, appellant went to Houston, leaving his car in Dallas. He later asked K.H. to bring the Mustang to Houston, but K.H. was in an automobile accident while traveling to Houston and appellant never regained possession of the vehicle.

Appellant left the United States, intending to go to Honduras, but only made it as far as Mexico. Appellant stated he followed the case on the internet, knew he was a suspect, and knew there was a $5,000 reward for his return. He told the detectives he wanted to turn himself in to authorities and was returning to the United States when he was ambushed by Zetas, ransomed for $3500 which was paid by his mother, and later caught by immigration officials being smuggled into the country.

Appellant went on to explain that J.A.Z. lived in the same apartment complex as Gonzalez; he initially thought his cousins were going to steal from an apartment but realized they were going to rob a person when he parked the Mustang in the dark area. Appellant believed the plan to rob was decided upon when they saw a person walking and J.A.Z. and K.H. asked to be let out at the corner. J.A.Z. then instructed appellant to park. They remained in the vehicle until the person walked closer to the car.

## Sufficiency of the Evidence

In his first issue, appellant claims that the evidence is legally insufficient to support his conviction for capital murder because he was not the shooter, the crime committed was a murder instead of a murder in the course of a robbery, he had no knowledge before the shooting that his cousins had a gun, and he expected his cousins' encounter with Gonzalez to be a theft like the one that occurred the day before in the park. The State agrees that the evidence presented at trial implicated J.A.Z., as opposed to appellant, as the shooter. The State responds, however, that the evidence supports appellant's conviction as co-conspirator to the offense and/or as a party to the conspiracy.

–6–

*Standard of Review*

A challenge to the sufficiency of the evidence is evaluated under the standards established in *Jackson v. Virginia* 443 U.S. 307, 316 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95. This standard of review for legal sufficiency is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001). Circumstantial evidence is considered as probative as direct evidence and is sufficient, standing alone, to establish a defendant's guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

We defer to the trier of fact's resolution of any conflicting inferences that are raised in the evidence and presume that the trier of fact, in this case the jury, resolved such conflicts in favor of the prosecution. *Jackson*, 443 U.S. at 318; *Brooks*, 323 S.W.3d at 894; *Sennett v. State*, 406 S.W.3d 661, 666 (Tex. App.—Eastland 2013, no pet.). We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. The State need not disprove all reasonable alternative hypotheses that are inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Rather, we consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13.

*The Indictment for Capital Murder and Applicable Law*

The indictment charged appellant with capital murder as follows:

> That JOSE REYNALDO ZAMORABANEGAS, hereinafter called Defendant, on or about the 21st day of June, 2016, in the County of Dallas, State

of Texas, did unlawfully then and there intentionally cause the death of JAIRO GONZALEZ, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, and the defendant was then and there in the course of committing and attempting to commit the offense of ROBBERY of said deceased.

As applied to this indictment, a person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits that murder during the course of a robbery or attempted robbery. TEX. PENAL CODE ANN. §§ 19.02(a), 19.03(a)(2).

A person commits robbery if, in the course of committing theft, and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE ANN. § 29.02(a). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. TEX. PENAL CODE § 31.03(a). "In the course of committing" refers to conduct occurring in an attempt to commit, during the commission of, or in the immediate flight after the attempt or commission of the murder. *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989).

A person commits aggravated robbery if he uses or exhibits a deadly weapon during the commission of a robbery. TEX. PENAL CODE ANN. § 29.03(a)(2). A firearm is a deadly weapon per se. TEX. PENAL CODE ANN. § 1.07(a)(17)(A).

In order to prove the offense of capital murder where robbery or attempted robbery is alleged as the aggravating element, the State need not prove a completed robbery, but must only show that an intent to rob was formed prior to or during the commission of the murder. *Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999); *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993). Intent to steal may be inferred from the facts. *McGee,* 774 S.W.2d at 235.

***The Jury Charge***

The jury charge in this case permitted conviction of appellant either as a principle, a party, or a co-conspirator:

> Now, if you unanimously find from the evidence beyond a reasonable doubt that on or about the 21st day of June 2016, in Dallas County, Texas, the defendant, Jose Reynaldo Zamora Banegas, *acting alone or as a party*, as that term is herein defined, did unlawfully then and there intentionally cause the death of Jairo Gonzalez, by shooting Jairo Gonzalez with a firearm, a deadly weapon, and the defendant was then and there in the course of committing or attempting to commit the offense of robbery of Jairo Gonzalez, then you will find the defendant guilty of the offense of Capital Murder as charged in the indictment.

OR

> If you unanimously believe from the evidence beyond a reasonable doubt that the defendant *entered into a conspiracy* with one or more persons to commit the felony offense of robbery and that on or about the 21st day of June 2016, in Dallas County, Texas, in the attempt to carry out this conspiracy, one or more of the conspirators did then and there intentionally cause the death of Jairo Gonzalez, by shooting Jairo Gonzalez with a firearm, a deadly weapon, while in the course of committing or attempting to commit the offense of robbery of Jairo Gonzalez and this act should have been anticipated as a result of the carrying out of the conspiracy, then you will find the defendant guilty of the offense of Capital Murder as charged in the indictment.

When the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara*, 152 S.W.3d at 49.

***The Law of Parties***

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. TEX. PENAL CODE ANN. § 7.01(a). A person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02 (2). Each party to an offense may be charged with commission of the

–9–

offense. TEX. PENAL CODE ANN. § 7.01(b). The law of parties applies to the offense of capital murder. *See Johnson v. State*, 853 S.W.2d 527, 534 (Tex. Crim. App. 1992) and cases cited therein.

Mere presence of a person at the scene of a crime either before, during or after the offense, or even flight from the scene, without more, is insufficient to sustain a conviction as a party to the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). However, combined with other incriminating evidence, a defendant's presence may be sufficient to sustain a conviction. *Id*. There must be sufficient evidence of an understanding and common design to commit the offense. *Id*.; *see also Guevara,* 152 S.W.3d at 49.

In determining whether a defendant participated as a party in the commission of an offense, the jury may consider events that occurred before, during or after the offense, and may rely on acts that show an understanding and common design. *Gross*, 380 S.W.3d at 186; *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996). Each fact need not point directly and independently to the guilt of the appellant as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Johnson v. State,* 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Williams v. State*, 473 S.W.3d 319, 325 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara,* 152 S.W.3d at 49.

### *The Law of Conspiracy*

The Texas Penal Code sets forth the law of criminal conspiracy:

> A person commits criminal conspiracy if, with intent that a felony be committed:

> (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and he or one or more of them performs an overt act in pursuance of the agreement.

TEX. PENAL CODE ANN. § 15.02(a)(1). The Code further provides for a defendant's liability as a co-conspirator:

–10–

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02. An agreement constituting a conspiracy may be inferred from acts of the parties. *Id.* § 15.02(b).

*Analysis*

When all the evidence is considered in the light most favorable to the verdict, it is clear that appellant, J.A.Z., and K.H. were acting together, as parties and/or co-conspirators, before, during, and after the shooting.

*Appellant was the Driver*

Appellant told the investigating detectives that he was the driver of the car both before, during and after the shooting. He drove J.A.Z. and K.H. to the apartment complex knowing that they intended to steal money to buy marijuana. Appellant parked the Mustang where J.A.Z. directed. As appellant told the interviewing detectives, his cousins, primarily J.A.Z., "told me a man was coming there in the street, on the sidewalk and they said they didn't have money and that they were going to rob him." Knowing their intent, appellant watched as J.A.Z. and K.H. got out of his vehicle, approached Gonzalez, and shot him. When his two cousins returned to the Mustang, appellant drove them away from the shooting, thus facilitating their flight.

From this evidence, the jury could have rationally concluded that appellant knew he was driving his cousins to a certain location for the purpose of committing a robbery, his cousins had pointed out their intended victim to him, and he later helped them flee the scene. Courts in Texas have repeatedly upheld convictions under the law of parties when the evidence establishes that the defendant participated in the commission of the offense by driving the getaway vehicle. *Brewer v. State*, 852 S.W.2d 643, 647 (Tex. App.—Dallas 1993, pet. ref'd) (stating that "evidence that a

–11–

defendant drove the getaway car after a robbery has been held sufficient to convict the driver as a party to the offense"); *see also Williams,*473 S.W.3d at 325–28; *Hooper v. State*, 255 S.W.3d 262, 266 (Tex. App.—Waco 2008, pet. ref'd); *Webber v. State*, 757 S.W.2d 51, 55–56 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd.). Here, a rational jury could find beyond a reasonable doubt that appellant, because of his participation as the driver and advance knowledge of his cousins' intent, aided the commission of the aggravated robbery with the requisite intent. *See Guevara*, 152 S.W.3d at 49; *Williams*, 473 S.W.3d at 325.

*Appellant was a Party to Conspiracy to Commit Robbery*

Appellant told the investigating detectives that his cousins, who were all minors, planned to commit robbery and expressed their intentions to him prior to the robbery. They had all been smoking marijuana minutes earlier and he understood J.A.Z and K.H. were going to steal money to purchase more. Appellant also understood that J.A.Z. and K.H. "had something" to assist in obtaining that money even though he claimed he only learned of the gun after the murder.

Knowing this, appellant drove J.A.Z. and K.H. to the apartment complex and parked in a dark area with his vehicle parked against the gate so as to facilitate a quick getaway. Appellant stayed in the vehicle waiting to flee the scene. Just after the shooting appellant fled the scene with his cohorts.

Appellant also told the investigating detectives that J.A.Z. was wearing black clothing that had the image of a skeleton. J.A.Z. pulled the skull top over his face before exiting the vehicle. This clearly shows that J.A.Z. was attempting to conceal his identity, which furthers the inference that appellant knew he was aiding in the commission of a robbery.

*Capital Murder was Committed in Furtherance of the Conspiracy*

Gonzalez suffered fatal injuries from the bullets fired at him during the robbery. The evidence presented suggests that J.A.Z. (or, perhaps, K.H.) was the shooter. Appellant told the

–12–

investigating detectives he heard two gunshots while he waited for them in his Mustang. When the two returned to the Mustang, appellant saw a gun in J.A.Z.'s waistband. Rather than stopping to assist Gonzalez or summoning help, appellant drove away from the scene. He later returned with J.A.Z. and K.H. in an effort to ascertain whether Gonzalez was dead.

In addition to the previously stated facts, appellant told the investigating detectives that when J.A.Z. and K.H. returned to the vehicle, they reported that Gonzalez said, "Yes, I will give you the money right now," but J.A.Z. and K.H. believed Gonzalez was retrieving a gun, so they shot him. Appellant certainly knew that a murder had been committed in the course of a robbery or an attempted robbery when he assisted his cousins' flight from the scene of the shooting.

### *Appellant Should Have Anticipated that Capital Murder Could Occur*

In order to convict appellant of capital murder, the State only had to prove appellant should have anticipated the murder not that he actually did anticipate the murder. *See Hooper*, 214 S.W.3d at 14. Appellant told the investigating detectives he knew of J.A.Z.'s history and the possibility that J.A.Z. had previously committed a murder in Honduras. Evidence that a defendant knew his co-conspirators had a history of violence or murder, and that they might use guns in the course of the offense, can be sufficient to demonstrate that appellant should have anticipated the murder. *Johnson v. State*, 421 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2014, no pet.). This is particularly true since appellant knew that J.A.Z. and K.H. "had something" to help them facilitate a robbery.

### *Flight*

As stated above, appellant drove his cousins away from the shooting, thus facilitating their flight as well as his own. Flight reflects consciousness of guilt. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (stating that a "factfinder may draw an inference of guilt from the circumstance of flight"); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) (same).

Not only did appellant flee the scene of the shooting, but he thereafter fled Dallas, going to Houston. He later fled the United States, making it to Mexico. This is evidence from which the jury could have drawn an inference of guilt.

*Conclusion*

When all of the facts and circumstances surrounding the offense are viewed in the light most favorable to the verdict, the evidence supports the jury's determination that appellant was guilty as a party to a conspiracy and/or as a co-conspirator to commit robbery. Accordingly, appellant was responsible for Gonzalez's murder during the course of a robbery or attempted robbery. We overrule appellant's first issue.

**Jury Charge**

In his second issue appellant claims that the trial court erred by allowing the jurors to have the original jury charge in the jury room during deliberations. Appellant claims that the error was harmful because that charge included a "star" on the only portion of the charge applying the law of conspiracy to capital murder. The State responds that it was not error for the trial court to send the original charge into jury deliberations and, even if it was, appellant has not suffered egregious harm because there is no evidence as to how the "star" came to be placed on the charge.

***What the Record Reflects***

The court reporter did not record or transcribe the trial court's reading of the charge to the jury.[7] A parenthetical notation in the record reflects as follows: "(Whereupon, the Jury Charge on guilt/innocence was read to the jury.)." The record thereafter reflects the following:

---

[7] We note that the Rules of Appellate Procedure require the official court reporter, unless excused by agreement of the parties, to make a full record of the proceedings. TEX. R. APP. P. 13.1(a). A court reporter's failure to transcribe the reading of the charge to the jury violates Rule 13.1(a) and can constitute error. *Brossette v. State*, 99 S.W.3d 277, 284 (Tex. App.—Texarkana 2003, pet. ref'd, untimely filed). However, because appellant did not object to the court reporter's failure to record or transcribe the reading of the charge to the jury, and because appellant does not complain of that failure on appeal, any error is waived. *Id.*; *Schindley v. State*, 326 S.W.3d 227, 231 (Tex. App.—Texarkana 2010, pet. ref'd).

THE COURT: Let me see the lawyers real quick, please.

(Off the record discussion.)

THE COURT: Let me make one change real quick. We'll get it sorted out.

The record yet again contains a parenthetical notation that reflects as follows: "(Whereupon, the Jury Charge on guilt/innocence was read to the jury.)"

The record does not reflect any objections to the charge after the change was made or to the trial court's subsequent reading of the charge.

### *Requisites of a Jury Charge*

The trial court must provide the jury with a written charge distinctly setting forth the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14. A proper charge should not express any opinion as to the weight of the evidence, not sum up the testimony, discuss the facts or use any argument calculated to arouse the sympathy or excite the passions of the jury. *Id*. The trial court judge is ultimately responsible for the accuracy of the jury charge and accompanying instructions. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). It is the trial judge's duty to ensure that all of the law applicable to the criminal offense set out in the indictment is incorporated into the jury charge as well as "the general admonishments, including reference to the presumption of innocence, proof beyond a reasonable doubt, unanimity of the verdict, and so forth." *Id*.

A trial court is required to read the final charge to the jury. TEX. CODE CRIM. PROC. ANN. art. 36.16. The charge is to be certified by the trial judge and filed among the papers in the case. TEX. CODE CRIM. PROC. ANN. art. 36.17. The law further provides that "[t]he jury may take to their jury room the charges given by the court after the same have been filed. They shall not be permitted to take with them any charge or part thereof which the court has refused to give." TEX. CODE CRIM. PROC. ANN. art. 36.18.

–15–

***Jury Charge Error***

In analyzing a claim of jury charge error, we must first determine if error exists. *See Almanza v. State*, 686 S.W.2d 157, 173–74 (Tex. Crim. App. 1985); *see also Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If it does not, our inquiry ends. *See Price*, 457 S.W.3d at 440. If, however, we find error in the charge, we next consider whether an objection to the charge was made and analyze the error for harm. *Id*. Where, as here, the defendant did not object to the charge, and the alleged error was not made sua sponte by the trial court, he is entitled to a reversal only if he suffered egregious harm as a result of the error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *see also Mendez v. State*, 545 S.W.3d 548, 553 (Tex. Crim. App. 2018). Egregious harm consists of errors that affect the very basis of the case or that deprive the defendant of a vital right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *Warner v. State*, 245 S.W.3d 458, 461–62 (Tex. Crim. App. 2008); *Estrada v. State*, 334 S.W.3d 57, 63 (Tex. App.—Dallas 2009, no pet.).

***Original Charge***

The charge in the clerk's record reflects a stamp "ORIGINAL." The charge also bears the handwritten word "original" and the date "5/17/18;" there are two initials under the handwritten date, which are not entirely clear but appear to possibly be "BB," and the numbers 292.[8] The charge reflects a clerk's file stamp on "May 21, 2018." While there is nothing in the record to indicate that this is the actual charge the jury took into the jury room during deliberations, we note that it is the only charge included in the appellate record.

Appellant has cited no case law to this Court, and we have found none, which prohibits the jury from having the original charge in the jury room during deliberations.

---

[8] This case was tried in the 292nd Judicial District Court of Dallas County and was presided over by the duly elected judge of that court, the Honorable Brandon Birmingham.

Appellant relies on the "plain meaning" of Chapter 36 of the Code of Criminal Procedure which he claims "establish(es) that the trial court may give the jurors a copy of the charge but not the original charge." However, no provision of Chapter 36 prohibits the jury from having the original charge during deliberations.

Further, we do not agree that the "plain meaning" of Chapter 36 mandates that the jury take only a copy of the charge into the jury room during deliberations. There are a few cases where it appears the original charge did accompany jurors into the jury room. In *Williams v. State*, 01-11-00407-CR, 2012 WL 1655550, at *5 (Tex. App.—Houston [1st Dist.] May 10, 2012, pet. ref'd)(mem. op. not designated for publication), it was discovered, after the jury had begun deliberating, that the charge omitted crucial portions of a statutory definition. The opinion reflects that, when the error was discovered, "the trial court interrupted deliberations, *retrieved the original charge from the jury*, submitted an amended charge . . . and instructed the jury to continue deliberating." *Id*. (emphasis added). In *Geesbreght v. Geesbreght*, 570 S.W.2d 427, 432 (Tex. Civ. App.—Fort Worth 1978, writ dism'd), deliberations were interrupted when the jury was brought back into court and told a supplemental charge would be submitted. That opinion states that the jury "took the supplemental *along with the original charge* into the jury room" and thereafter returned its verdict "as embraced by its answers to all special issues of *both the original and supplemental charges*." *Id*. (emphasis added). Nothing in these cases indicate that it was improper for the jury to have the original charge in the jury room during their deliberations.

And, as the State points out in its brief to this Court, original verdict forms are often given to the jury and become a part of the charge. *See Jennings v. State*, 302 S.W.3d 306, 307 (Tex. Crim. App. 2010) (stating that when a verdict form is used, it becomes a part of the jury charge and is incorporated by reference into the main charge). The practice of attaching an original verdict

form to the charge is indicative that an original charge is permitted to be taken into the jury room during deliberations.

We therefore conclude that, even if the jury had the original charge in the jury room during deliberations, no error is shown.

***The "Star" on the Jury Charge does not Demonstrate Egregious Harm***

Even if the jury had the original charge, and it was error for the jury to have that charge during deliberations, the record does not demonstrate egregious harm.

The written charge contained in the clerk's record shows a "small black star" on page six of the charge in the application paragraph of the conspiracy theory of capital murder:

> If you unanimously believe from the evidence beyond a reasonable doubt that the defendant entered into a conspiracy with one or more persons to commit the felony offense of robbery and that on or about the 21st day of June 2016, in Dallas County, Texas, in the attempt to carry out this conspiracy, one or more of the conspirators did then and there intentionally cause the death of Jairo Gonzalez, by shooting Jairo Gonzalez with a firearm, a deadly weapon, while in the course of committing or attempting to commit the offense of robbery of Jairo Gonzalez; *and this act should have been anticipated as a result of the carrying out of the conspiracy, then you will find the defendant guilty of the offense of Capital Murder as charged in the indictment.

Appellant claims that the "star" emphasized conspiracy and insured a conviction on that theory.

The State responds that appellant's argument are based on assumptions and conjecture as there is no evidence as to how the mark came to be on the charge. Indeed, appellant admits in his brief to this Court that it is impossible to ascertain whether the "star" was put on the charge by the trial court, one of the attorneys, a member of the court's staff, or one of the jurors during their deliberations. We agree that, because the record is silent as to how the star came to be on the charge, it cannot be assumed that the "star" indicates a change made by the trial court or that the trial court, if it did make that change, sought to emphasize any portion of the charge.

While it is obvious from the recorded exchange while the charge was being read to the jury that some alteration was made to the charge, it is impossible under the record before this Court to

–18–

know exactly what was changed in the charge.[9] *See Veras v. State*, 410 S.W.3d 354, 357–58 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (stating "this court cannot conclude that appellant preserved error based upon speculation or supposition as to what may have occurred during a bench conference at which no record was made"). It cannot simply be assumed that anything in the application paragraph of conspiracy to commit capital murder was altered.

Based on this record, we cannot conclude that appellant has suffered egregious harm. We overrule appellant's second issue.

**Motion to Suppress**

In his third issue appellant claims that the trial court abused its discretion by overruling his motion to suppress statements he made to Dallas Police detectives about this offense. Appellant relies on the lack of a written waiver of his rights and on claims that, because federal agents had previously spoken to appellant, there is no showing by the State that appellant did not invoke his rights at that time. The State responds that appellant received the requisite warnings, freely and voluntarily waived his rights, and voluntarily spoke with the detectives.

*Hearing on the Motion to Suppress*

Prior to trial, a hearing was held on appellant's motion to suppress statements he made to Dallas Police detectives. The sole witness at the hearing was former Dallas Police Detective Pedro Trujillano.[10] Trujillano testified that he had been a homicide detective with the Dallas Police department for approximately two years and, prior to that, a robbery detective for approximately three years. During those five years, he estimated that he interviewed over one hundred suspects.

---

[9] We note that, had the court reporter made a record or transcription of the trial court reading the charge to the jury, all parties, as well as this Court, would know exactly what change the trial court made to the jury charge.

[10] At the time of trial Trujillano was working for the Frisco Police Department.

Trujillano testified that he had been born in Peru and lived there until he came to the United States at the age of eleven. Spanish was his native language. Additionally, he had a degree in Spanish and literature from the University of Texas at Arlington. Trujillano acknowledged that there could be differences in the Spanish language as it was spoken in Peru and Honduras but stated "I have plenty of interactions with people from Central America, so I understand pretty well."

On March 21, 2017, Trujillano accompanied lead detective Shelton to Laredo to interview appellant. They met with appellant in the Webb County jail. Appellant was in custody and not free to leave. Appellant had not initiated contact with the Dallas detectives.

Trujillano testified that he conducted his interview of appellant in Spanish. Trujillano also read appellant his *Miranda* warnings[11] in Spanish "exactly what it was on the cards." Trujillano testified that appellant acknowledged that he understood his rights though he never signed a formal written waiver of those rights. Appellant seemed to understand everything and Trujillano never noticed a time during the interview when there was a miscommunication.

There were no deals or promises made to appellant and the officers neither threatened nor coerced appellant. To the contrary, the officers had a casual conversation with appellant that lasted approximately forty-five minutes and appellant was cooperative and responsive throughout the interview.

When asked by defense counsel if he knew whether appellant had been advised of his rights by federal authorities, Trujillano testified as follows:

> Q. Do you know whether the federal agents before talking to him ever read him his rights?
>
> A. I do not, sir.
>
> Q. Is it possible they could have?

---

[11] *Miranda v. Arizona*, 384 U.S. 436 (1966); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22 §2(a).

–20–

A. It's possible.

Q. Okay. We'd have to ask them, right?

A. Have to ask them or Detective Shelton that had primary contact with them.

Q. Okay. So if they did read him his rights, you wouldn't know about it, correct?

A. They would advise me that, I'm sure they would have advised us if he declined to talk or not.

Q. But they didn't advise you about anything, about their interview with him before you interviewed him, correct?

A. No, sir.

The video of the interview conducted in Spanish, as well as the written certified English translation of that interview were admitted as exhibits for record purposes. The English translation reflects the following exchange between Trujillano and appellant:

[TRUJILLANO]: I'm going to read you your rights, alright?

[APPELLANT]: Yes.

[TRUJILLANO]: Had they read you your rights before?

[APPELLANT]: Yes, they told them to me.

***Arguments of Defense Counsel and the Prosecutor***

In arguing that the trial court should grant appellant's motion to suppress, defense counsel asked the trial court to take into consideration that "there's no signed waiver in this case." Counsel acknowledged that on the video of the interview appellant was asked if he understood his rights and he said that he did, but "there's no specific waiver other than actual rights . . . we believe that that's in violation of the U.S. Constitution and the Texas Constitution."

Defense counsel also asked the trial court to take into consideration that (1) the federal agents spoke to appellant before the detectives spoke to him, (2) there was no "paperwork" to

–21–

establish that the agents did not read appellant his rights, (3) if appellant had been read his rights and he had invoked his right to an attorney, then he would have had to initiate the contact with the officers, and (4) it was shown that appellant did not initiate contact with the Dallas detectives. Defense counsel stated "because we have that question out there of whether federal agents talked to him and read him his rights, I think it's a basis for which the Court can decide that this statement should not be seen by the jury."

The State admitted that appellant was in custody; he had been detained for immigration purposes but had an active warrant for capital murder. Immigration agents had alerted the Dallas Police Department when appellant was in custody.

With respect to waiver, the State argued that it was clear that appellant had voluntarily waived his *Miranda* rights at the time of the interview: "There's no coercion. There's no threats. There's nothing like that. The nature of the conversation, the casual nature, the fact the defendant was freely talking to them, never wanted to terminate the interview at any point." The prosecutor quoted directly from the English translation of the interview:

> [BY THE PROSECUTOR] It ends with Detective Trujillano saying, "Do you understand the rights that I've read to you?"
>
> And the defendant saying, "Yes."
>
> "Are you willing to talk with me about the case?"
>
> "Yes."

The prosecutor asked that the trial court deny the motion to suppress and "allow us to present this statement to the jury."

### Trial Court's Findings and Ruling

At the conclusion of the hearing, the trial court denied the motion to suppress. The trial court dictated the following findings of fact and conclusions of law to the court reporter:

THE COURT: First of all, the Court will find that the statement was made on March the 21st of 2017 . . .

The Court makes the factual finding that the defendant was in custody and he was not free to leave and he was being interrogated. The Court therefore makes the finding that 38.22 and Miranda were therefore triggered because this was a custodial interrogation.

The Court finds that Detective Trujillano . . . had five years of experience in interviewing defendants . . . I believe he said a hundred – that this (interview) was conducted in the Webb County jail, that Detective Shelton was there, that the demeanor of the defendant throughout the interview was cooperative, that the defendant was engaged, that there did not appear to be at any time a inability to communicate.

The Court finds regarding Detective Trujillano's knowledge of speaking Spanish to the defendant is borne from the fact that that's his native tongue. He did, in fact, grow up in Peru. The interview was obviously conducted in Spanish, and that the rights read to him (appellant) comply with Miranda and 38.22.

Regarding the issue of not having a signed waiver, the Court feels that there's no specific requirement in any of the cases that I've read that would require that.

The evidence contained in Court's Exhibits[12] 1 and 2 and also the testimony of the witness satisfy the Court that the defendant did understand his rights and made a knowing and voluntary waiver thereof.

There doesn't appear to be anything based on the record that I have before me that any of the interactions alluded to the federal agents appear to have impacted this decision of the defendant at all; therefore, the Court finds that the statement was voluntarily and knowingly made, that it was compliant with 38.22, that it was compliant with Miranda and it's federal progeny, as well as Texas counterparts and Texas Constitution.

The trial court stated that it was giving appellant a "running objection to the statement throughout the trial."

Appellant did not formally object to these findings, nor does he challenge any particular finding made by the trial court on appeal.

---

[12] It is clear from the context of the record that the trial court is referring to the videotaped interview and the written translation.

–23–

*Additional Arguments and Remarks of Counsel*

At the conclusion of the hearing, and after the trial court had made its ruling on the motion to suppress and announced its findings, both defense counsel and the prosecutor made statements concerning what, if anything, existed to show the interaction between appellant and federal agents prior to appellant speaking with the Dallas detectives.

Defense counsel stated as follows:

> [DEFENSE COUNSEL]: I had a conversation with the State and I had asked if there was any . . . documents from the federal agents indicating any conversations they had with him (appellant) or whether they interviewed him. And the State said that they had reached out and tried to find if there was anything. . . . they've indicated there was no paperwork. There was nothing indicating in writing about any interview with him.
>
> And I would just ask the State, and I'm sure they'll do it, is if they do find something between now and the trial or if the agent says, hey, I found this paperwork back in my office, to please let us know.

The prosecutor responded as follows:

> [THE PROSECUTOR]: I can affirmatively say that the federal agents did not have any conversations with him about this case. They gave him some sort of immigration questionnaire to figure out where he came from and stuff like that. I'm doing my best to find this questionnaire and try to get it from ICE. It's my understanding it would have no relation to this case whatsoever. But in, you know, in an abundance of caution, I'm doing my best to try to hunt that down. I've been doing that probably two months now. Hopefully, it comes in before trial and I get it to the defense. If it doesn't, I feel comfortable telling the Court based on my conversations with Detective Shelton and those agents that there is nothing in there that would have any materiality to this statement or this case.

*Standard of Review: Motion to Suppress*

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *Wilson v. State*, 311 S.W.3d 452, 457–58 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's determination of historical facts, but conduct a *de novo* review of the trial court's application of the law to those facts. *Wilson*, 311 S.W.3d at 458. As the sole trier of fact during a suppression

hearing, a trial court may believe or disbelieve all or any part of a witness's testimony. *Id.* We examine the evidence in the light most favorable to the trial court's ruling. *Id.* A trial court will abuse its discretion only if it refuses to suppress evidence that is obtained in violation of the law and that is inadmissible under TEX. CODE CRIM. PROC. ANN. art. 38.23. *Id.*

Where, as here, the trial court has made express findings of fact, we view the evidence in the light most favorable to those findings and determine whether the evidence supports the fact findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if it is supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48.

***Abatement is Not Required***

As part of this issue, appellant claims that, because the trial court made no specific findings as to whether he had invoked his right to counsel before Trujillano interrogated him, this Court should abate this appeal and order the trial court to make findings on this issue. The State responds that abatement is unnecessary because "the findings contained in the record are sufficient to enable the parties to fully address, and the appellate courts to review, the trial court's ruling." We agree.

It is undisputed that appellant was detained by immigration officials at the time he was interviewed by Trujillano. Appellant acknowledged that federal agents told him his rights. However, contrary to appellant's assertions on appeal, there is nothing in the record which establishes that appellant invoked his right to counsel, or any other right, after being advised of his rights by federal agents.

Further, the trial court specifically found as follows: "There doesn't appear to be anything based on the record that I have before me that any of the interactions alluded to the federal agents appear to have impacted this decision of the defendant at all." This is a sufficient finding from

which this Court can conclude that the trial court found that appellant did not previously invoke any of his rights to the extent that Trujillano was prohibited from speaking to appellant.

### *A Written Waiver is not Required*

The Code of Criminal Procedure establishes procedural safeguards for securing the privilege against self-incrimination. TEX. CODE CRIM. PROC. ANN. art. 38.22. The Code provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3. The warning must inform a defendant of the following rights:

(1) the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.

*Id*. art. 38.22 § 2; *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The statute contains two distinct elements pertaining to a statement's admissibility: (1) the defendant's receipt of the prescribed warning and (2) his waiver of the rights set out in the warning. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010).

Appellant does not assert that he was not warned of his rights by Detective Trujillano. Rather, appellant argues that his statement is of questionable admissibility because he did not sign a written waiver of those rights.

The State has the burden of showing that a defendant knowingly, intelligently, and voluntarily waived his Miranda rights. *See Miranda*, 384 U.S. at 444, 475; *Joseph,* 309 S.W.3d at 24. The State must prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Joseph*, 309 S.W.3d at 24. Neither a written nor an oral express waiver is required. *Joseph*, 309 S.W.3d at 24; *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988). A waiver need not assume any particular form and can even be inferred from the actions and words of the person interrogated. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Joseph*, 309 S.W.3d at 24. The trial court recognized this in its findings, stating as follows: "Regarding the issue of not having a signed waiver, the Court feels that there's no specific requirement in any of the cases that I've read that would require that." The trial court's finding is supported by law and is not erroneous.

### The Statement was Voluntary

The Texas Code of Criminal Procedure provides that a defendant's statement may be used against him only "if it appears that the same was freely and voluntarily made without compulsion or persuasion." *See* TEX. CODE CRIM. PROC. ANN. art. 38.21. The determination of whether a statement is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *Creager* v. State, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997); *see also Arizona v. Fulminante*, 499 U.S. 279, 285–86 (1991).

A statement may be deemed "involuntary" under three different theories: (1) failure to comply with TEX. CODE CRIM. PROC. art. 38.22 § 6; (2) failure to comply with the dictates of *Miranda v. Arizona* as codified and expanded in Article 38.22 §§ 2, 3; or (3) failure to comply with due process because the statement was not freely given as a result of coercion, improper influences, or incompetency. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App.

2008); *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996). A statement may be deemed involuntary under one, two, or all three of these theories. *See Oursbourn*, 259 S.W.3d at 169.

The United States Supreme Court has articulated a specific test for evaluating whether an accused's waiver was voluntary:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *Joseph*, 309 S.W.3d at 25–27 (applying this test to an issue of waiver under both *Miranda* and article 38.22). The totality of the circumstances test requires the consideration of "all the circumstances surrounding the interrogation," including the defendant's experience, background, and conduct. *Joseph*, 309 S.W.3d at 25.

Here, the totality of the circumstances surrounding the interrogation shows appellant's waiver was voluntary. Trujillano testified that he read appellant his *Miranda* warnings in Spanish "exactly what it was on the cards."[13] Appellant acknowledged that he understood his rights. When asked "Are you willing to talk with me about the case?" appellant replied "Yes." Appellant seemed to understand everything and Trujillano never noticed a time during the interview when there was a miscommunication. Trujillano testified that he neither threatened nor coerced appellant; the officers had a casual conversation that lasted approximately forty-five minutes during which appellant was cooperative and responsive.

---

[13] The actual card on which the warnings were printed was not introduced into evidence at the hearing on the motion to suppress. However, the reading of the warnings appears on the Spanish language video and also in the certified English translation; those warnings track the warnings required by statute. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2.

Based on the totality of the circumstances, we conclude that the trial court did not err by determining that the State had met its burden to show that appellant's decision to talk to the detectives was voluntary and that his subsequent statements were voluntarily made. We conclude the trial court did not abuse its discretion by denying appellant's motion to suppress. We overrule appellant's third issue.

## Modification of Judgment

In his fourth issue, appellant claims that the judgment should be modified to reflect a conviction for capital murder based on a robbery instead of capital murder based on a terroristic threat. The State, in its brief to this Court, agrees.

The indictment alleged that appellant murdered the complainant while in the course of committing and attempting to commit robbery. The jury charge permitted conviction for either capital murder committed during the course of a robbery, murder, or aggravated robbery. The jury convicted appellant of "Capital Murder, as charged in the indictment." The judgment, however, contains the entry ""Capital Murder Terroristic Threat" in the "Offense for which Defendant Convicted" field.

We have the authority to modify an incorrect judgment when the evidence necessary to correct that judgment appears in the record. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we sustain appellant's fourth issue and modify the trial court's judgment to read "Capital Murder Robbery" in the "Offense for which Defendant Convicted" field in that judgment.

## Conclusion

As modified, we affirm the trial court's judgment.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

180612F.U05

–30–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSE REYNALDO ZAMORA
BANEGAS, Appellant

No. 05-18-00612-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1600847-V.
Opinion delivered by Justice Osborne.
Justices Schenck and Reichek participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

the offense is "Capital Murder Robbery"

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 24th day of July, 2019.